## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FORT MYER CONSTRUCTION CORPORATION**, a Virginia Corporation, 2237 33rd Street, NE, Washington DC 20018, <br><br> **Plaintiff,** <br><br> **v.** <br><br> **JASON SHRENSKY**, an individual, 9300 Marseille Drive, Potomac MD 20854, <br><br> **AND** <br><br> **JAS INVESTORS MARYLAND, LLC**, a Maryland limited liability company, 1455 Research Boulevard, Suite 510, Rockville MD 20850, <br><br> **Defendants.** | **Civil Action No.** _____ <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED COMPLAINT

Plaintiff FORT MYER CONSTRUCTION CORPORATION, by counsel files this Verified Complaint and alleges against Defendants JASON SHRENSKY and JAS INVESTORS MARYLAND, LLC as follows:

## NATURE OF ACTION

1.      This is an action by Plaintiff Fort Myer Construction Corporation ("FMCC") against Defendants Jason Shrensky ("Shrensky") and JAS Investors Maryland, LLC ("JAS Investors") for trade secret misappropriation, tortious inference with contractual relations, breach of contract, and conversion.

## PARTIES

2.      FMCC is incorporated in the Commonwealth of Virginia and maintains its

principal place of business in the District of Columbia.

3.      Shrensky is a resident and citizen of the State of Maryland. Prior to his

resignation on August 17, 2023, Shrensky was Chief Technology Officer of FMCC. Shrensky is

the sole member of JAS Investors.

4.      JAS Investors is an LLC formed in Maryland. JAS Investors provided services to

FMCC in the District of Columbia.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action under 28 U.S.C. § 1332. The amount in

controversy exceeds $75,000. FMCC is a citizen of the Commonwealth of Virginia (where it is

incorporated) and the District of Columbia (where its principal place of business is located).

Shrensky is a citizen of the State of Maryland. JAS Investors is an LLC entity formed in the

State of Maryland. The sole member of JAS Investors is a resident of the State of Maryland.

6.      The Court also has jurisdiction over this action under 28 U.S.C. § 1331 and 28

U.S.C. § 1367 because FMCC asserts claims against Shrensky and JAS Investors under the

federal Defend Trade Secrets Act ("DTSA") and the state law claims form part of the same case

or controversy.

7.      The Court has personal jurisdiction over Shrensky because he worked for FMCC

in this District.

8.      The Court has personal jurisdiction over JAS Investors because it performed and

performs services for FMCC in this District.

9.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events

giving rise to this action occurred in the District of Columbia.

## FACTUAL BACKGROUND

**Fort Myer Construction Corporation's Confidential Information and Proprietary Software**

10.     FMCC performs infrastructure construction and repair work for the federal government, state and local governments, school districts, colleges and universities, and private sector partners and clients, such as Washington Gas Light Company and Pepco, in the District of Columbia, Maryland and Virginia (the "DMV").

11.     Operating out of facilities in the District and Maryland, FMCC is currently performing work on more than 1,000 critical transportation, utility and infrastructure projects throughout the DMV, including the George Washington Memorial Parkway rehabilitation project, the construction and repair of major bridges and tunnels, and the replacement of critical water mains.

12.     FMCC has invested significant time and resources developing proprietary processes through which it manages its construction contracts and activities, its fleet and equipment, its employees, its relationship with customers and regulators, and other operations.

13.     Through these efforts and investment, FMCC has developed proprietary databases, software and confidential information (the "Confidential Information") that provides FMCC a competitive advantage in the construction industry. FMCC's Confidential Information allows FMCC seamlessly to manage and implement critical operations and functions, including (1) coordinating its work for and sharing Confidential information with clients, such as Washington Gas Light Company ("Washington Gas"); (2) deploying and supervising FMCC's trucks and equipment; (3) identifying and responding to accidents; (4) tracking and supervising drivers and other personnel; (5) offering shifts to employees; (6) conducting safety training; and (7) meeting its contractual obligations to FMCC's clients.

14.     FMCC has invested considerable time, money, and effort to protect the secrecy of its Confidential Information and to ensure that such information is not disclosed outside the Company, or to the public generally. FMCC maintains formal policies and procedures to ensure that its employees, contractors and vendors maintain the secrecy of its Confidential Information.

15.     FMCC requires each of its employees to execute a Confidentiality Agreement that prohibits FMCC employees from using or disclosing FMCC's Confidential Information without prior authorization. The Confidentiality Agreement states, in relevant part:

> **Confidential Information**. Employee's position with the Company will necessarily give Employee access to, contact with and knowledge of certain trade secrets, and confidential and proprietary business information of the Company. This information includes but is not limited to marketing and sales objectives and strategies, customer lists, information regarding existing customers, information regarding prospective customers, details of past, pending and contemplated transactions, price lists, pricing policies, sales data, training materials, customer proposals, information develop about the Company's competitors, systems, strategies, designs, processes, procedures, market data, know-how, compilations of technical and non-technical data, advertising and promotional plans and strategies, and financial and other projections relating to the **Business**, which are not generally known to or readily ascertainable through legitimate means by the public or by the Company's competitors (hereinafter collectively referred to as "Confidential Information"). Employee shall not disclose at any time the Confidential Information of the Company to anyone without prior written authorization from the Chief Operating Officer and on a need-to-know basis in connection with Employee's duties in carrying out the Company's business. Employee shall not use any Confidential Information of the Company for his or her own benefit, or for the benefit of anyone other than the Company.

16.     FMCC also requires its employees to review and sign an acknowledgment that they reviewed the Employee Handbook. The Employee Handbook prohibits employees from disclosing, improperly using, or retaining copies of FMCC's Confidential Information, including Plaintiff FMC's intellectual property. The Employee Handbook states:

> **Section 5.13:** During the course of work, an employee may become aware of confidential information about Fort Myer Construction Corporation's business, including but not limited to information regarding FMCC finances, pricing, products and new product development, software and computer programs, marketing strategies, suppliers and customers and potential customers. An

4

employee also may become aware of similar confidential information belonging to FMCC's clients. It is extremely important that all such information remain confidential, and particularly not be disclosed to our competitors. Any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of FMCC may be subject to disciplinary action up to and including termination. Employees are required to sign an agreement reiterating these obligations.

**Section 5.15:** Employees also are prohibited from any unauthorized use of FMCC's intellectual property, such as audio and video tapes, print materials and software. Improper, careless, negligent, destructive, or unsafe use or operation of equipment can result in discipline, up to and including discharge.

17.    Further, immediately upon an employee or contractor's departure, FMCC terminates such employee's access to FMCC's systems and requires such employees to turn over FMCC's property, including access cards, laptops and mobile devices. Under the Employee Handbook, all Confidential Information and "[a]ll FMCC property including, but not limited to, keys, security cards, parking passes, laptop computers, fax machines, uniforms, etc., must be returned at separation."

18.    FMCC maintains physical and technological protections of its Confidential Information, including building and gate security, access cards, locked offices, and password-protected computers, devices, drives and databases.

**Development of FMCC's Proprietary CUTS System**

19.    For over 20 years, FMCC and Washington Gas have entered into five-year Permanent Restoration & Paving Agreements (the "Washington Gas Agreements") for construction and repair work in the District involving Washington Gas' lines and operations. The most recent contract was signed by the parties on May 1, 2020.

20.    The current Washington Gas Agreement provides that "[t]he services performed by [FMCC] will be pursuant to specific Work Requests (as defined below) which are an integral part of and supplement the terms and conditions of this Agreement."

21.     One such "Work Request" includes repairing "cuts" ("Washington Gas Cuts") for Washington Gas throughout the District of Columbia. The Washington Gas Agreement requires FMCC to "provid[e] Washington Gas with a daily schedule via email of cuts to be repaired" and "provide a timeline for the completion of the priority cuts in writing within two (2) business days suitable to Washington Gas."

22.     The Washington Gas Agreement also contains provisions concerning the "Treatment of Confidential Information." These provisions state, in relevant part:

> **Confidential Information.** All computer programs and documentation owned by either party or licensed by either party or its affiliates from third parties, samples, passwords, trade secrets, business plans, financial and operational information, customer information, and other information of any nature concerning either party or its affiliates, to which the other party obtains access in connection with this Agreement, are deemed to be "Confidential Information.

> **Non-Disclosure.** Each party agrees that it shall not use or permit the use of any Confidential Information of the other party except for purposes of this Agreement, nor disclose or permit to be disclosed the Confidential Information of the other party to any person (other than its own employees, agents, representatives, or affiliated entities having a reasonable need for such information in order to provide the performance of this Agreement and are bound by obligations of confidentiality and limited use no less restrictive than those contained herein), nor duplicate any Confidential Information of the other party which consists of computer software or documentation or other materials expressly restricted against copying, unless such duplication, use or disclosure is specifically authorized in writing by the other party.

23.     To comply with FMCC's obligations under the Washington Gas Agreement, FMCC developed over the years a software and database called CUTS to schedule, coordinate and track Washington Gas Cuts. CUTS included tens of thousands of rows of Confidential Data relating to FMCC and Washington Gas's operations, including information relating to work requests, work locations, permit statuses, scheduling and invoicing.

24.     CUTS was developed to interface with a proprietary software maintained and operated by Washington Gas called ARMS. Washington Gas uploaded work orders and requests

to ARMS, including the location, scope, and permit information relating to them. FMCC, in turn, transferred the work requests from ARMS to CUTS.

25.     FMCC and Washington Gas worked together (and continue to work together) to develop capabilities in CUTS that allow ARMS and CUTS to communicate with each other seamlessly.

26.     Over the years, FMCC continued to develop and enhance its CUTS software to fulfill its obligations under the Washington Gas Agreement and more effectively to coordinate its work for Washington Gas. For example, in or around September 2014, FMCC developed and integrated into CUTS a process for real-time monitoring of backlogs of Washington Gas Cuts, which allowed FMCC to quickly dispatch crews to priority sites.

27.     In March 2020, FMCC hired Jason Shrensky through JAS Investors to supervise the 2020 Washington Gas Agreement.  JAS Investors' first invoice to FMCC charged the Company $80,000 for "[c]onsulting and supervision of Washington Gas contract and related software development on FMCC's CUTS system." During the period from November 2020 to September 2021, JAS Investors billed FMCC a total of $200,000 for these services.

28.     JAS Investors CEO Shrensky worked with FMCC personnel to understand the obligations imposed by and work performed by FMCC under the 2020 Washington Gas Agreement.  Shrensky, coordinating with FMCC and Washington Gas personnel, provided reports to Washington Gas and attended meetings concerning FMCC's performance under the 2020 Washington Gas Agreement.

29.     Among other information, Shrensky reported to Washington Gas concerning FMCC's key performance metrics, including average cycle time for completing work requests, average cycle time for invoicing work requests, managing Washington Gas Cuts, and resolving priority Cuts.

30.     As part of his supervision of the Washington Gas contract, Shrensky worked with FMCC and Washington Gas personnel to develop and implement enhancements to CUTS.  In meetings with FMCC and Washington Gas, Shrensky recognized that CUTS was FMCC's proprietary system and that it differentiated it from other contractors in the DMV. Shrensky represented that FMCC had "developed a ***proprietary system (CUTS)*** to track all [work requests] so that nothing gets missed . . . ***No one in the industry is better equipped to manage [Washington Gas'] requests.***"

31.     In connection with his work for FMCC, Shrensky was an employee for copyright purposes as specified in 17 U.S.C. § 101:

   a.   FMCC provided Shrensky with extensive resources and information, including personnel, equipment, Confidential Information of FMCC, confidential internal customer data of Washington Gas, technical data, and other corporate resources.

   b.   FMCC provided substantial guidance to Shrensky regarding the ARMS and CUTS systems and their expectations with respect to the enhancements to CUTS.

   c.   FMCC had the right to and did assign additional projects to Shrensky.  While working as a putative "consultant," FMCC performed the role of a project manager for Washington Gas and performed the role he assumed in September 2021 – CTO.

   d.   In his interactions with Washington Gas and others, Shrensky held himself out as an authorized representative of FMCC who was authorized to speak on behalf of the Company concerning its line business activities.

   e.   Neither JAS Investors nor Shrensky hired any assistants or staff to assist Shrensky in performing work for FMCC.

8

      f.   The salary FMCC paid Shrensky after FMCC hired him as CTO was comparable to the fees he was paid as a putative consultant of FMCC.

      g.   The work performed by Shrensky was part of the regular business of FMCC performing construction work for clients in the DMV, including Washington Gas.

      h.   Shrensky routinely worked from FMCC facilities and offices while implementing changes to CUTS.

32.     In September 2021, FMCC hired Shrensky as FMCC's Chief Technology Officer ("CTO").  As CTO, Defendant Shrensky's scope of employment, duties and responsibilities included his work on CUTS and additionally:

> The Chief Information Officer will develop, plan, and implement a technological (IT) strategy that meets the company's business needs, delivers optimal return on investment, and maintains utmost security. Assist the company's strategy and ensure that all systems necessary to support its operations and objectives are in place.

33.     On December 6, 2021, Shrensky signed a written agreement ("Employment Agreement") with FMCC. The Employment Agreement included an Employee Confidentiality Agreement ("Confidentiality Agreement") attached as **Exhibit 1**. The Confidentiality Agreement states:

> **Confidential Information**. Employee's position with the Company will necessarily give Employee access to, contact with and knowledge of certain trade secrets, and confidential and proprietary business information of the Company. This information includes but is not limited to marketing and sales objectives and strategies, customer lists, information regarding existing customers, information regarding prospective customers, details of past, pending and contemplated transactions, price lists, pricing policies, sales data, training materials, customer proposals, information develop about the Company's competitors, systems, strategies, designs, processes, procedures, market data, know-how, compilations of technical and non-technical data, advertising and promotional plans and strategies, and financial and other projections relating to the **Business**, which are not generally known to or readily ascertainable through legitimate means by the public or by the Company's competitors (hereinafter collectively referred to as "Confidential Information"). Employee shall not disclose at any time the Confidential Information of the Company to anyone without prior written

authorization from the Chief Operating Officer and on a need-to-know basis in connection with Employee's duties in carrying out the Company's business. Employee shall not use any Confidential Information of the Company for his or her own benefit, or for the benefit of anyone other than the Company.

34.     The Confidentiality Agreement provides that all documents and work product relating to FMCC's Confidential Information and business operations and activities shall be the exclusive property of FMCC. Specifically, the Agreement states:

> **Ownership of Records.** All records, reports, notes, compilations or other recorded matter, and copies or reproductions thereof, in whatever media or form, including electronic media, relating to the Company's Confidential Information, operations, activities or Business, made or received by Employee during any period of employment with the Company are and shall be the exclusive property of the Company. Employee must keep the same at all times in his or her custody, subject to the Company's control, and must take all reasonable steps to maintain its confidentiality. Employee will return all Company property containing Confidential Information, including computer hardware and software, CDs, PDSs, or any other similar devices at the end of his or her employment, if not before. Failure to return Company property upon the request of the Company during any period of employment or thereafter shall be a material breach of this Agreement.

35.     As part of Shrensky's employment, he also signed FMCC's General Handbook Acknowledgement, under which Defendant J. Shrensky acknowledged that he received, read, and agreed to the provisions of FMCC's Employee Handbook quoted above.

36.     After FMCC hired Shrensky, FMCC paid him an annual salary of $312,000 as CTO. His duties as CTO included the supervision of the continued development and enhancement of CUTS, as well as the development of two additional software programs (the "Proprietary Software"): (1) FMC Safely ("Safely") and (2) FMC Fleet ("Fleet").

37.     Initially, the Proprietary Software provided tools that allowed FMCC to manage its fleet and employees and compliance with legal and contractual obligations. Over time, the functions of the Proprietary Software expanded to include employee scheduling, payroll, and customer invoicing and payment.

38.     While he was CTO, Shrensky presented information about FMCC's performance under the Washington Gas Agreement in bi-annual Supplier Relationship Management Meetings with Washington Gas. In these presentations, Shrensky updated Washington Gas concerning the modifications and enhancements FMCC had made to CUTS.

39.     During one such meeting in September 2022, Shrensky informed attendees that "***FMCC's CUTS system continues to be improved*** with features to streamline our work with Washington Gas and make it more efficient, e.g., DBE spend is now tracked with the CUTs system."

40.     In this meeting, Shrensky also described CUTS as ***FMCC's "proprietary system*** . . . to track all WRs so that nothing gets missed." Defendant J. Shrensky represented that FMCC's "CUTS system is modeled off the data structure of ARM. ***No one in the industry is better equipped to manage Washington Gas's requests***."

41.     In a June 9, 2023 meeting, Shrensky advised the attendees that "FMCC's CUTS system ***continues to be improved*** with features to streamline our work with Washington Gas and make it more efficient, e.g., ***automatic updating of occupancy permit statuses from DDOT emails***." This development was significant because FMCC previously had to manually obtain permit information and statuses from the District of Columbia Department of Transportation website.

42.     Shrensky also informed the attendees that, using CUTS, "FMCC has improved its process for allocating work to crews. Washington Gas should notice that by March 2023, FMCC is processing as many as 20% more [work orders] per month when compared to prior periods."

43.     FMCC developed and adopted additional enhancements to CUTS after it hired Shrensky as CTO, including, among other things: (1) tracking site visits with an interactive map; (2) allowing Washington Gas to approve repairs and site visits; (3) enhancing the District

Department of Transportation's ("DDOT") permitting feature so that FMCC can file permits with DDOT and track the status of each permit through CUTS; (4) developing an automated system for transferring data in CUTS to Washington Gas' database; and (5) adopting a process for calculating payment adjustments for liquid asphalt and concrete based on liquid asphalt and concrete prices under the Maryland Index.

44.     FMCC also paid JAS Investors monthly fees "related to the hosting of the CUTS DC site." JAS Investors charged Plaintiff $1,800 per year for hosting CUTS and required that FMCC pre-pay the full $1,800 amount at the start of the hosting period, which runs from November to October of the following year.

45.     On November 1, 2020, FMCC paid JAS Investors $1,800.00 for hosting services through October 31, 2021.

46.     CUTS and the Proprietary Software are the exclusive property of FMCC.

47.     As the exclusive property of FMCC, FMCC must be given continuous access to CUTS and the data in it, and neither CUTS nor the Proprietary Software may be used or disclosed by JAS Investors, Shrensky or any other person for his or her own benefit, or for the benefit of anyone other than FMCC.

48.     FMCC recently discovered that Shrensky was using CUTS and the Proprietary Software for the benefit of Shrensky and JAS Investors and was actively marketing FMCC's software and systems to competitors of FMCC.

49.     As a consequence, on August 8, 2023, FMCC placed Shrensky on administrative leave pending investigation.  In the notice for suspension attached as **Exhibit 2**, FMCC notified Shrensky that:

> I am writing to inform you that you have been suspended from Fort Myer
> Construction Corporation ("FMCC") pending investigation.  While you are on
> suspension, you should not access any FMCC premises, or access any systems or

databases or contact any FMCC employees, contractors, vendors, or customers. During this period, you will not have any authority to act on behalf of the company.  Milton Hardy will be in contact with you in the next several days to schedule an interview with outside counsel.

50.      Prior to suspending Shrensky, FMCC cut off his access to its communications systems and databases, including its email system and CUTS and the Proprietary Software. However, because JAS Investors hosted CUTS and the Proprietary Software through Azure, FMCC could not eliminate JAS's administrator credentials to CUTS and the Proprietary Software.

51.      On August 9, 2023, FMCC sent Shrensky a letter attached as **Exhibit 3** demanding that he:

      a.  Take all steps necessary to establish and confirm FMCC's ownership of CUTS and the Proprietary Software (the "FMCC Software");

      b.  Cease marketing and attempting to sell FMCC Software; and

      c.  Cease representing that JAS Investors or Shrensky has an ownership interest in the FMCC Software.

52.      On August 11, 2023, Shrensky accessed without authorization the Fleet database using administrative credentials to send email to FMCC employees and third-parties on behalf of his father, Lewis Shrensky ("L. Shrensky"), the former Executive Vice President of FMCC.  The email falsely claimed L. Shrensky was still the Executive Vice President.

53.      Shrensky's unauthorized access to the Fleet database violated Shrensky's Employment Agreement, the Employee Handbook, the BEP, the Suspension Notice and federal and state law.

54.     In his August 14, 2023 letter attached as **Exhibit 4**, counsel for Shrensky merely stated that the August 9, 2023 letter from FMCC's counsel "contains significant factual and legal errors."

55.     On August 17, 2023, counsel for FMCC sent a letter attached as **Exhibit 5** to counsel for Shrensky addressing Shrensky's unauthorized access to FMCC's Fleet database. FMCC demanded that Shrensky cease accessing FMCC's systems, databases, and software for any purpose, cease communicating with FMCC employees, contractors and customers, and transfer administrative rights to all FMCC databases and software to FMCC.

56.     That same day, Shrensky resigned from his employment with FMCC, claiming he was "illegally placed on suspension."

57.     On August 17, 2023, counsel for Shrensky sent a letter attached as **Exhibit 6** to FMCC's counsel claiming that Shrensky could continue to access FMCC's databases and systems because FMCC did not have the "right" to terminate him:

> As to your demands regarding Jason Shrensky, the underlying factual and legal premises are wrong: Fort Myer had no right to suspend Jason Shrensky . . . and, therefore, has no authority to demand that Jason Shrensky cease accessing Fort Myer's systems and databases and/or contacting Fort Myer's employees, contractors, vendors or customers. In any event, Jason Shrensky has resigned from Fort Myer effective today. As to any allegations concerning Jason Shrensky's access to and/or management of his own software programs, Fort Myer will receive correspondence from Jason Shrensky's intellectual property counsel in the coming days.

58.     On August 18, 2023, Terence Ross, counsel for Shrensky, sent FMCC the response attached as **Exhibit 7**. Mr. Ross stated, without elaboration, that Defendant JAS Investors "owns the copyright to" CUTS. Mr. Ross **demanded that FMCC purchase "a license from JAS" for the use of CUTS for an annual licensing fee of $260,000** and monthly maintenance charges at a rate of $250 per hour.

14

59.     That same day, in the email attached as **Exhibit 8**, counsel for FMCC asked Mr. Ross to provide documentation supporting his position that CUTS was owned by JAS Investors. Rather than provide any agreement or other evidence purporting to support Shrensky's or JAS Investors' ownership of CUTS, Mr. Ross merely replied with a cursory summary of the Copyright Act, stating that because "Mr. Shrensky wrote the CUTS software [he] is, therefore, the author and owner of the copyright in CUTS." (*See* **Exhibit 8**).

60.     On August 24, 2023, FMCC sent Mr. Ross an email attached as **Exhibit 9** in an attempt to amicably resolve this matter, explaining FMCC's position that it owned or, at a minimum, had a joint ownership interest in CUTS, and proposing that the parties reach a mutually agreeable resolution for the use and licensing of CUTS. Unfortunately, as set forth below, Shrensky rejected this generous offer of sharing a copyright interest when in fact he was not entitled to any claim of ownership in CUTS.

61.     FMCC is in fact the sole copyright owner of CUTS. It created the original version in-house, then engaged Shrensky under the Work for Hire provisions of the Copyright Act, 17 U.S.C. § 101. Specifically, as an employee for copyright purposes under the test articulated by the Supreme Court in *CCNV v. Reid*, 490 U.S. 730 (1989), then as a formal employee to assist in creating derivatives of the original in-house created CUTS.

62.     The same day, Mr. Ross rejected FMCC's proposal in a letter attached as **Exhibit 10**, stating "[w]e are not interested in negotiating a 'mutually-agreeable resolution' for the licensing of CUTS . . . FMCC has no rights in CUTS software developed solely by Jason Shrensky."

63.     The very next day (August 25, 2023), Shrensky used his administrator access to cut off FMCC's access to CUTS. As of the date of this filing, neither FMCC nor FMCC's partners at Washington Gas have access to CUTS.

64.     As a consequence of Shrensky's unauthorized access to FMCC's CUTS database, 10-12 employees at FMCC and 5-6 employees at Washington Gas do not have access to critical information in CUTS necessary to coordinate and implement Washington Gas Cuts.

65.     For the over 800 pending Cuts work requests from Washington Gas, including over 100 requests received in the last two days, FMCC is now required to manually locate and input the Cuts information in an Excel spreadsheet to attempt to "recreate" the information that was readily accessible to it through CUTS just last week.

66.     By unilaterally depriving FMCC and Washington Gas of its access to CUTS, Shrensky has jeopardized FMCC's ability to provide critical repairs to Washington Gas' operations and to comply with its obligations under the Washington Gas Agreement.

## FIRST CAUSE OF ACTION
### (Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 – Defendants Shrensky and JAS Investors)

67.     FMCC realleges and incorporates herein by reference each and every allegation above as though set forth in full herein.

68.     FMCC owns and possesses certain Confidential Information that it has compiled after many years of substantial effort and significant financial investment.

69.     FMCC's Confidential Information derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

70.     FMCC has made reasonable efforts under the circumstances to preserve the confidentiality of its Confidential Information. These efforts include requiring employees to sign confidentiality and other employment agreements, using passwords to protect access to Confidential Information on company computers, and limiting access to FMCC's Confidential Information on a need-to-know basis.

71.     This Confidential Information constitutes FMCC's trade secrets.

72.     Shrensky and JAS Investors acquired FMCC's trade secrets under circumstances giving rise to a duty to maintain the secrecy of FMCC's trade secrets by working on software programs based on FMCC's Confidential Information that is the exclusive property of FMCC.

73.     Shrensky knowingly and improperly used FMCC's trade secrets by depriving FMCC of access to them and using them for the benefit of Shrensky's and his company, JAS Investors.

74.     Despite FMCC's requests, Shrensky has refused to discontinue his misuse of FMCC's trade secrets.

75.     If Shrensky is not enjoined, he will continue to use, disclose, or otherwise misappropriate FMCC's trade secrets for his benefit and to FMCC's detriment.

76.     Shrensky's misappropriation of FMCC's trade secrets has caused and continues to cause substantial injury to FMCC's business interests and reputation, including, but not limited to, actual damages, lost profits, harm to its reputation, and the diminution of the value of FMCC's trade secrets. Shrensky has further been unjustly enriched by his misappropriation of FMCC's trade secrets, for example by enhancing Shrensky's ability to compete in FMCC's industry.

77.     FMCC therefore seeks injunctive relief under 18 U.S.C. § 1836(b)(3)(A) to protect the secrecy of FMCC's trade secrets and to remedy injury to FMCC's business interests and reputation. FMCC will continue to suffer irreparable harm absent the requested injunctive relief.

78.     FMCC also seeks an award of actual damages and damages for unjust enrichment in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

79.     On information and belief, Shrensky misappropriated FMCC's trade secrets for an improper purpose and in a willful and malicious manner. FMCC therefore seeks exemplary damages up to two times the award of actual damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D), together with pre- and post-judgment interest.

## SECOND CAUSE OF ACTION

**(Trade Secret Misappropriation Under the District of Columbia Uniform Trade Secrets Act, D.C. Code § 36-401 – Defendants Shrensky and JAS Investors)**

80.     FMCC realleges and incorporates herein by reference each and every allegation above as though set forth in full herein.

81.     For the same reasons set forth above in relation to the First Cause of Action, Shrensky and JAS Investors have misappropriated FMCC's trade secrets under District of Columbia law.

82.     Defendants' misappropriation of FMCC's trade secrets has directly and proximately caused damage to FMCC and its business. FMCC is therefore entitled to an award of actual damages in an amount to be proven at trial.

83.     At all times, the above-described actions have caused and are continuing to cause irreparable injury to FMCC, for which FMCC has no adequate remedy at law, and will continue to cause irreparable injury unless enjoined. FMCC therefore seeks injunctive relief against Shrensky and JAS Investors to prevent further damage and harm to FMCC under D.C. Code § 36-402.

84.     FMCC also seeks an award of actual damages and damages for unjust enrichment in an amount to be proven at trial under D.C. Code § 36-403(a), together with pre- and post-judgment interest.

85.     On information and belief, Shrensky's misappropriation of FMCC's trade secrets has been conducted in a willful and malicious manner. FMCC therefore seeks exemplary damages in an amount not exceeding twice the award of damages under D.C. Code § 36-403(b) as well as its attorney's fees under D.C. Code § 36-404.

### THIRD CAUSE OF ACTION
**(Breach of Confidentiality Agreement – Defendant Shrensky)**

86.     FMCC realleges and incorporates herein by reference each and every allegation above as though set forth in full herein.

87.     The Confidentiality Agreement is an express, written agreement between FMCC and Shrensky.

88.     FMCC fully performed its obligations under the Confidentiality Agreement.

89.     Shrensky breached the terms of the Confidentiality Agreement by misappropriating confidential and proprietary information and property from FMCC and actively using FMCC's confidential and proprietary information and property for the benefit of Shrensky and JAS Investors.

90.     Shrensky's breach of the Confidentiality Agreement has actually and proximately caused FMCC to suffer damages.

91.     Plaintiff seeks an award of compensatory damages in an amount to be proven at trial, together with pre- and post-judgment interest.

### FOURTH CAUSE OF ACTION
**(Breach of Implied License – Defendants Shrensky and JAS Investors)**

92.     FMCC realleges and incorporates herein by reference each and every allegation above as though set forth in full herein.

93.     FMCC hired Shrensky and JAS Investors to make enhancements to CUTS using FMCC's Confidential Information and preexisting data, processes, and procedures.

19

94.     Shrensky and JAS Investors made enhancements and modifications to CUTS at FMCC's request.

95.     FMCC and Shrensky and JAS Investors knew and intended that CUTS was to be used exclusively for FMCC's purposes and for fulfilling FMCC's obligations under the Washington Gas Agreement.

96.     Shrensky and JAS Investors delivered to FMCC an enhanced version of CUTS for FMCC's use in fulfilling its obligations under the Washington Gas Agreement.

97.     To the extent Shrensky and JAS Investors claimed any ownership interest in this enhanced version of CUTS, Shrensky and JAS Investors granted FMCC an implied license to use CUTS for performing FMCC's obligations under the Washington Gas Agreement.

98.     By revoking FMCC's access to CUTS on August 25, 2023, Shrensky and JAS Investors breached the terms of the implied license.

99.     Shrensky's breach of the implied license has actually and proximately caused FMCC to suffer damages.

100.     FMCC seeks an award of compensatory damages in amount to be proven at trial, together with pre- and post-judgment interest. FMCC also seeks injunctive relief compelling Shrensky and JAS Investors to grant FMCC access to CUTS and enjoining Shrensky and JAS Investors from any future misuse of CUTS.

**FIFTH CAUSE OF ACTION**
**(Conversion – Defendant Shrensky)**

101.     FMCC realleges and incorporates herein by reference each and every allegation above as though set forth in full herein.

102.     Shrensky has exercised ownership, dominion and control over the intellectual property otherwise lawfully belonging to FMCC.

103.    Shrensky has obtained such ownership, dominion and control over such intellectual property through improper means, including violations of Shrensky's Confidentiality Agreement.

104.    FMCC has been directly and proximately injured by Shrensky's unlawful conversion of its property.

105.    FMCC seeks an award of monetary damages in an amount to be proven at trial, punitive damages, costs and attorney's fees, together with pre- and post-judgment interest.

**SIXTH CAUSE OF ACTION**
**(Tortious Interference with Contractual Relations – Defendant Shrensky)**

106.    FMCC realleges and incorporates herein by reference each and every allegation above as though set forth in full herein.

107.    FMCC is party to a contractual relationship with Washington Gas.

108.    Shrensky was aware of FMCC's contractual relationship with Washington Gas.

109.    Shrensky deliberately and without privilege, justification, or authorization interfered with FMCC and Washington Gas' agreed-upon contractual and business relationship, for the wrongful purpose of depriving FMCC of the full benefit of that relationship.

110.    Shrensky's wrongful and intentional activities constitute tortious interference with contractual relations.

111.    As a direct, foreseeable, and proximate result of Shrensky's knowing and intentional tortious interference, FMCC suffered damages.

112.    FMCC is entitled to punitive damages resulting from Shrensky's wanton, willful, and malicious conduct, all of which was undertaken by Shrensky with a reckless disregard for FMCC's rights.

## SEVENTH CAUSE OF ACTION
### (Declaratory Judgment, Copyright – Defendants Shrensky and JAS Investors)

113.    FMCC realleges and incorporates herein by reference each and every allegation above as though set forth in full herein.

114.    FMCC originated and created CUTS to fulfill its obligations under the Washington Gas Agreement.

115.    FMCC retained Shrensky and JAS Investors to develop enhancements and modifications to CUTS.

116.    Shrensky and JAS Investors were retained under the Work for Hire provisions of the Copyright Act, 17 U.S.C. § 101. Shrensky and JAS Investors were at all times employees of FMCC for copyright purposes.

117.    Shrensky and JAS Investors developed CUTS within the scope of their employment.

118.    As a Work for Hire, FMCC owns all of the copyright rights comprised in FMCC.

119.    Any subsequent versions of CUTS developed by Shrensky and JAS Investors constitute derivative works of the original CUTS software.

120.    FMCC's copyright in CUTS subsists in all derivative versions of CUTS.

121.    FMCC is entitled to a declaratory judgment that it is the sole owner of CUTS.

## PRAYER FOR RELIEF

WHEREFORE, FMCC respectfully requests that the Court:

a.    Enter judgment against Defendants Shrensky and JAS Investors and in favor of Plaintiff FMCC in an amount to be proven at trial, plus pre-judgment and post-judgment interest, plus the costs of this action, plus punitive and exemplary damages;

      b.      Enter preliminary and permanent relief enjoining Defendant Shrensky and Defendant JAS Investors from accessing, using, selling, or attempting to sell Plaintiff FMCC's Proprietary Software;

      c.      Enter preliminary and permanent relief compelling Defendant J. Shrensky and Defendant JAS Investors to reinstate Plaintiff FMCC's access to CUTS;

      d.      Pursuant to 28 U.S.C. § 2201, issue a declaration that Shrensky and JAS Investors do not have any copyright in CUTS and FMCC owns all copyright in CUTS; and

      e.      Grant such further relief as the Court may deem appropriate.

Jury Trial Requested.

Dated: August 30, 2023

Respectfully submitted,
BERTRAM LLP

By: _____
Connie N. Bertram

BERTRAM LLP
1717 K Street, NW, Suite 900
Washington, DC 20006
Telephone: (866) 456-1159
Email: cbertram@bertramllp.com
D.C. Bar No. 435840

*Counsel for Plaintiff*
FORT MYER CONSTRUCTION
CORPORATION

## <u>UNSWORN DECLARATION UNDER PENALTY OF PERJURY</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I, Matthew Hill, am

an authorized agent of Fort Myer Construction Corporation, that I have read the allegations set

forth above in the **VERIFIED COMPLAINT**, and that to the best of my knowledge,

information and belief such representations are true and accurate.

Executed on: August 30, 2023

*Matthew Hill*
Matthew Hill