**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FORT MYER CONSTRUCTION CORPORATION,**<br>**Plaintiff,**<br>**v.**<br>**JASON SHRENSKY,**<br>**AND**<br>**JAS INVESTORS MARYLAND, LLC,**<br>**Defendants.** | **Civil Action No. 1:23-cv-02539-CJN**<br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff FORT MYER CONSTRUCTION CORPORATION, by counsel files this Amended Complaint and alleges against Defendants JASON SHRENSKY and JAS INVESTORS MARYLAND, LLC as follows:

## INTRODUCTION

This lawsuit arises because Shrensky, a former employee of FMCC, and his consulting company, JAS Investors, falsely claimed ownership rights in software he claims he developed while working for FMCC. This software was never owned by Shrensky or JAS Investors because it was a work made for hire under the Copyright Act and because Shrensky and JAS Investors contractually assigned to FMCC all rights in the software. Adding insult to injury, after FMCC initiated this lawsuit and filed a motion seeking restoration of access to its own software, Shrensky and JAS Investors terminated FMCC's access to and then deleted or adulterated the software and data, depriving FMCC of the injunctive relief sought through the motion. Shrensky and JAS Investors' undisputed actions vis-à-vis FMCC's software and proprietary information constitute serious breaches of their legal obligations to FMCC and preservation obligations to this Court.

## PARTIES

1. FMCC is incorporated in the Commonwealth of Virginia and maintains its principal place of business in the District of Columbia.

2. Shrensky is a resident and citizen of the State of Maryland. Prior to his resignation on August 17, 2023, Shrensky was Chief Technology Officer ("CTO") of FMCC. Shrensky is the sole member of JAS Investors. In connection with his work for FMCC, Shrensky performed work for FMCC in the Commonwealth of Virginia, Maryland and the District of Columbia.

3. JAS Investors is an LLC formed in Maryland. JAS Investors provided services to FMCC in the Commonwealth of Virginia, Maryland and the District of Columbia.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000. FMCC is a citizen of the Commonwealth of Virginia (where it is incorporated) and the District of Columbia (where its principal place of business is located). Shrensky is a citizen of the State of Maryland. JAS Investors is an LLC entity formed in the State of Maryland. The sole member of JAS Investors is Shrensky, a resident of the State of Maryland.

5. The Court also has jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338(a), and 28 U.S.C. § 1367 because FMCC asserts claims against Defendants under the federal Defend Trade Secrets Act ("DTSA") and the federal Copyright Act, and the state law claims form part of the same case or controversy.

6. The Court has personal jurisdiction over Shrensky because he worked for FMCC in this District.

7. The Court has personal jurisdiction over JAS Investors because it entered into a contract with FMCC and performed services for FMCC in this District.

8. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in the District of Columbia.

## FACTUAL BACKGROUND

**FMCC's Confidential Information and the FMCC Software**

9. FMCC performs infrastructure construction and repair work for the federal government, state and local governments, school districts, colleges and universities, and private sector partners and clients, such as Washington Gas Light Company ("Washington Gas") and Pepco, in the District of Columbia, Maryland and Virginia (the "DMV").

10. Operating out of facilities in the District, Virginia and Maryland, FMCC is currently performing work on more than 1,000 critical transportation, utility and infrastructure projects throughout the DMV, including the George Washington Memorial Parkway rehabilitation project, the construction and repair of major bridges and tunnels, and the replacement of critical water mains.

11. FMCC has invested significant time and resources developing the proprietary processes through which it performs under its contracts with customers and manages its construction contracts and activities, its fleet and equipment, its employees, its relationship with customers and regulators, and other operations.

12. Through these efforts and investment, FMCC has developed proprietary databases, software and confidential information (the "Confidential Information") that, as Shrensky himself has repeatedly recognized, provides FMCC a competitive advantage in the construction industry. FMCC's Confidential Information allows FMCC seamlessly to manage and implement critical operations and functions, including (1) coordinating its work for and sharing Confidential information with clients, such as Washington Gas; (2) deploying and supervising FMCC's trucks and equipment; (3) identifying and responding to accidents; (4) tracking and supervising drivers

and other personnel; (5) offering shifts to employees; (6) managing the licenses, certifications and training of employees; (7) conducting safety and other training; and (7) meeting its contractual obligations to FMCC's clients.

13. FMCC has invested considerable time, money, and effort to protect the secrecy of its Confidential Information and to ensure that such information is not disclosed outside the Company, or to the public generally. FMCC maintains formal policies and procedures to ensure that its employees, contractors and vendors maintain the secrecy of its Confidential Information.

14. FMCC requires each of its employees to execute a Confidentiality Agreement that defines what constitutes Confidential Information and prohibits FMCC employees from using or disclosing Confidential Information without prior authorization. The Confidentiality Agreement provides, in relevant part, that:

> **Confidential Information**. Employee's position with the Company will necessarily give Employee access to, contact with and knowledge of certain trade secrets, and confidential and proprietary business information of the Company. This information includes but is not limited to marketing and sales objectives and strategies, customer lists, information regarding existing customers, information regarding prospective customers, details of past, pending and contemplated transactions, price lists, pricing policies, sales data, training materials, customer proposals, information develop about the Company's competitors, systems, strategies, designs, processes, procedures, market data, know-how, compilations of technical and non-technical data, advertising and promotional plans and strategies, and financial and other projections relating to the **Business**, which are not generally known to or readily ascertainable through legitimate means by the public or by the Company's competitors (hereinafter collectively referred to as "Confidential Information"). Employee shall not disclose at any time the Confidential Information of the Company to anyone without prior written authorization from the Chief Operating Officer and on a need-to-know basis in connection with Employee's duties in carrying out the Company's business. Employee shall not use any Confidential Information of the Company for his or her own benefit, or for the benefit of anyone other than the Company.

15. FMCC also requires its employees to review and sign an acknowledgment that they reviewed the Employee Handbook. The Employee Handbook prohibits employees from

disclosing, improperly using, or retaining copies of FMCC's Confidential Information, including Plaintiff FMCC's trade secrets and intellectual property. The Employee Handbook states:

> **Section 5.13:** During the course of work, an employee may become aware of confidential information about Fort Myer Construction Corporation's business, including but not limited to information regarding FMCC finances, pricing, products and new product development, software and computer programs, marketing strategies, suppliers and customers and potential customers. An employee also may become aware of similar confidential information belonging to FMCC's clients. It is extremely important that all such information remain confidential, and particularly not be disclosed to our competitors. Any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of FMCC may be subject to disciplinary action up to and including termination. Employees are required to sign an agreement reiterating these obligations.
>
> **Section 5.15:** Employees also are prohibited from any unauthorized use of FMCC's intellectual property, such as audio and video tapes, print materials and software. Improper, careless, negligent, destructive, or unsafe use or operation of equipment can result in discipline, up to and including discharge.

16. Further, immediately upon an employee or contractor's departure, FMCC terminates the former employee or contractor's access to FMCC's systems and requires such employees to turn over and return FMCC's property, including access cards, laptops and mobile devices. Under the Employee Handbook, all Confidential Information and "[a]ll FMCC property including, but not limited to, keys, security cards, parking passes, laptop computers, fax machines, uniforms, etc., must be returned at separation."

17. FMCC maintains physical and technological protections of its Confidential Information, including building and gate security, access cards, locked offices, and password-protected computers, devices, drives and databases.

**Development of FMCC's Proprietary CUTS System**

18. Washington Gas is a utility company that provides natural gas and electricity to customers in the District of Columbia, Maryland, Virginia, Delaware and Pennsylvania. The headquarters for Washington Gas is located in Springfield, Virginia.

19. For over 20 years, FMCC and Washington Gas have entered into five-year Permanent Restoration & Paving Agreements (the "Washington Gas Agreements") for construction and repair work involving Washington Gas' lines and operations. The most recent contract was signed by the parties on May 1, 2020.

20. The current Washington Gas Agreement provides that "[t]he services performed by [FMCC] will be pursuant to specific Work Requests which are an integral part of and supplement the terms and conditions of this Agreement."

21. One such Work Request includes repairing "cuts" on and in streets and sidewalks created by Washington Gas employees and contractors in replacing and repairing pipelines ("Washington Gas Cuts"). The Washington Gas Agreement requires FMCC to "provid[e] Washington Gas with a daily schedule via email of cuts to be repaired" and "provide a timeline for the completion of the priority cuts in writing within two (2) business days suitable to Washington Gas."

22. The Washington Gas Agreement also contains provisions concerning the "Treatment of Confidential Information." These provisions state, in relevant part:

> **Confidential Information.** All computer programs and documentation owned by either party or licensed by either party or its affiliates from third parties, samples, passwords, trade secrets, business plans, financial and operational information, customer information, and other information of any nature concerning either party or its affiliates, to which the other party obtains access in connection with this Agreement, are deemed to be "Confidential Information."
>
> **Non-Disclosure.** Each party agrees that it shall not use or permit the use of any Confidential Information of the other party except for purposes of this Agreement, nor disclose or permit to be disclosed the Confidential Information of the other party to any person (other than its own employees, agents, representatives, or affiliated entities having a reasonable need for such information in order to provide the performance of this Agreement and are bound by obligations of confidentiality and limited use no less restrictive than those contained herein), nor duplicate any Confidential Information of the other party which consists of computer software or documentation or other materials expressly restricted against copying, unless such duplication, use or disclosure is specifically authorized in writing by the other party.

23. To comply with FMCC's obligations under the Washington Gas Agreement, FMCC developed software and databases called CUTS used by both FMCC and Washington Gas to schedule, coordinate and track Washington Gas Cuts. CUTS included tens of thousands of rows of Confidential Information and embedded macros relating to FMCC and Washington Gas' operations, including information relating to work requests, work locations, permit statuses, scheduling and invoicing.

24. CUTS was developed by FMCC to interface with FMCC Software maintained and operated by Washington Gas called Weekly Inventory Cut Sheet ("WICS") and Asset Resource Management System ("ARMS"). Washington Gas uploaded work orders and requests to WICS and ARMS, including the location, scope, and permit information relating to them. FMCC, in turn, obtained information concerning new work requests from WICS and ARMS and uploaded them to CUTS to manage and monitor FMCC's completion of work orders and requests and to generate invoices for payment.

25. FMCC and Washington Gas worked together (and continue to work together) to develop capabilities in CUTS that allow WICS, ARMS and CUTS to communicate with each other seamlessly, and more effectively allow Washington Gas and FMCC to manage the thousands of work orders and requests that are processed through CUTS each year.

26. Over the years, FMCC continued to develop and enhance CUTS to fulfill its obligations under the Washington Gas Agreement and more effectively to coordinate its work for Washington Gas. For example, in or around September 2014, FMCC developed and integrated into CUTS a process for real-time monitoring of backlogs of Washington Gas Cuts, which allowed FMCC to quickly dispatch crews to priority sites.

27. In March 2020, Shrensky, through JAS Investors, started working with FMCC employees on CUTS pursuant to a work order issued under the Consulting Agreement between

FMCC and JAS Investors described in Paragraphs 35 to 41 below. FMCC retained Shrensky and JAS Investors to perform "[c]onsulting and supervision of Washington Gas contract and related software development on FMCC's CUTS system." *See* **Ex. 1**. During the period from November 2020 to September 2021, JAS Investors billed FMCC and FMCC paid to JAS Investors over $200,000 pursuant to the work order for these services. *See* **Ex. 2**.

28. Shrensky worked with FMCC personnel to understand the obligations imposed by the Washington Gas Agreement and the Cuts work performed by FMCC using WICS, ARMS and CUTS. Shrensky, coordinating with FMCC and Washington Gas personnel, provided reports to Washington Gas and attended meetings concerning FMCC's performance under key performance metrics in the Washington Gas Agreement, including average cycle time for completing work requests, average cycle time for invoicing work requests, and managing and resolving priority Cuts.

29. As part of his supervision of the Washington Gas contract, Shrensky worked with FMCC and Washington Gas personnel to develop and implement enhancements to CUTS. In meetings with FMCC and Washington Gas, Shrensky recognized that CUTS was FMCC's proprietary system and that CUTS differentiated FMCC from competitors in the DMV. Shrensky represented that FMCC had "developed a ***proprietary system (CUTS)*** to track all [work requests] so that nothing gets missed . . . ***No one in the industry is better equipped to manage [Washington Gas'] requests."***

**FMCC Hires Shrensky as its CTO**

30. In September 2021, FMCC hired Shrensky as FMCC's Chief Technology Officer ("CTO"). A copy of the job description for the CTO position is attached as **Exhibit 3**.

31. On December 6, 2021, Shrensky signed the Employee Confidentiality and Screening Agreement ("Confidentiality Agreement") attached as **Exhibit 4** with FMCC. The

Confidentiality Agreement prohibited Shrensky from disclosing or using Confidential Information of FMCC:

> **Confidential Information**. Employee's position with the Company will necessarily give Employee access to, contact with and knowledge of certain trade secrets, and confidential and proprietary business information of the Company. This information includes but is not limited to marketing and sales objectives and strategies, customer lists, information regarding existing customers, information regarding prospective customers, details of past, pending and contemplated transactions, price lists, pricing policies, sales data, training materials, customer proposals, information develop about the Company's competitors, systems, strategies, designs, processes, procedures, market data, know-how, compilations of technical and non-technical data, advertising and promotional plans and strategies, and financial and other projections relating to the **Business**, which are not generally known to or readily ascertainable through legitimate means by the public or by the Company's competitors (hereinafter collectively referred to as "Confidential Information"). Employee shall not disclose at any time the Confidential Information of the Company to anyone without prior written authorization from the Chief Operating Officer and on a need-to-know basis in connection with Employee's duties in carrying out the Company's business. Employee shall not use any Confidential Information of the Company for his or her own benefit, or for the benefit of anyone other than the Company.

32. The Confidentiality Agreement also provided that all documents and work product relating to FMCC's Confidential Information and business operations and activities were the exclusive property of FMCC. Specifically, the Agreement stated:

> **Ownership of Records.** All records, reports, notes, compilations or other recorded matter, and copies or reproductions thereof, in whatever media or form, including electronic media, relating to the Company's Confidential Information, operations, activities or Business, made or received by Employee during any period of employment with the Company are and shall be the exclusive property of the Company. Employee must keep the same at all times in his or her custody, subject to the Company's control, and must take all reasonable steps to maintain its confidentiality. Employee will return all Company property containing Confidential Information, including computer hardware and software, CDs, PDSs, or any other similar devices at the end of his or her employment, if not before. Failure to return Company property upon the request of the Company during any period of employment or thereafter shall be a material breach of this Agreement.

33. As part of Shrensky's employment, he also signed FMCC's General Handbook Acknowledgement, under which Shrensky acknowledged that he had received, read, and agreed to the provisions of FMCC's Employee Handbook quoted above. *See* **Ex. 5**.

34. FMCC paid Shrensky an annual salary of $312,000 as CTO. His duties as CTO included working with FMCC employees on the continued development and enhancement of CUTS.

35. After FMCC hired Shrensky as CTO, JAS Investors continued to provide services to FMCC pursuant to the Consulting Agreement. Among other services, JAS Investors provided hosting services for CUTS and other FMCC Software (defined in Paragraph 45 below).

36. While he was CTO of FMCC, Shrensky worked with employees of FMCC and Washington Gas to develop, among others, enhancements to CUTS, including: (1) tracking site visits with an interactive map; (2) allowing Washington Gas to approve repairs and site visits; (3) enhancing the District Department of Transportation's ("DDOT") permitting feature so that FMCC could file permits with DDOT and track the status of each permit through CUTS; (4) developing an automated system for transferring data in CUTS to Washington Gas' databases; and (5) adopting a process for calculating payment adjustments for liquid asphalt and concrete based on liquid asphalt and concrete prices under the Maryland Index.

37. While he was CTO, Shrensky presented information about FMCC's performance under the Washington Gas Agreement to FMCC's employees and partners in bi-annual Supplier Relationship Management Meetings with Washington Gas. In these presentations, Shrensky updated Washington Gas concerning the modifications and enhancements FMCC had made to CUTS.

38. During one such meeting in September 2022, Shrensky informed attendees that "***FMCC's CUTS system continues to be improved with features to streamline our work with***

***Washington Gas and make it more efficient***, e.g., DBE spend is now tracked with the CUTs system."

39. In this meeting, Shrensky also described CUTS as ***FMCC's "proprietary system . . . to track all WRs so that nothing gets missed."*** Shrensky represented that FMCC's "CUTS system is modeled off the data structure of ARM. ***No one in the industry is better equipped to manage Washington Gas's requests***."

40. In a June 9, 2023 meeting, Shrensky advised the attendees that "FMCC's CUTS system ***continues to be improved*** with features to streamline our work with Washington Gas and make it more efficient, e.g., ***automatic updating of occupancy permit statuses from DDOT emails***." This development was significant because FMCC previously had to manually DDOT website, which was a time-consuming and laborious exercise.

41. Shrensky also informed the attendees that, using CUTS, "FMCC has improved its process for allocating work to crews. Washington Gas should notice that by March 2023, FMCC is processing as many as 20% more [work orders] per month when compared to prior periods."

42. As CTO, Shrensky also worked with FMCC employees and outside vendors to develop two additional software programs: (1) FMC Safely ("Safely") and (2) FMC Fleet ("Fleet").

43. FMCC uses Fleet to manage the operations of its fleet of vehicles and for other operations. The system tracks and manages most aspects of FMCC's fleet operations, including without limitation: (1) vehicle inventory; (2) vehicle defects and repairs; (3) safety inspections; (4) personnel and payroll for drivers; (5) assignment of vehicles and drivers to tasks and work orders; (6) time management and control; (7) reports of and responses to accidents; and (8) customer invoicing and payment.

44. FMCC developed and used Safely to manage licenses, certifications and training of its employees. After the software was developed, FMCC employees expended hundreds of work-hours populating the database with historical information concerning the licenses, certifications and training of each FMCC employee. Fleet was used by FMCC to (1) manage the licenses and certifications, including DOT certifications, of drivers and other employees; (2) manage the renewal and recertification of employees' licenses and certifications; and (3) conduct and document training of employees, including mandatory sexual harassment and cultural sensitivity training. Safely allowed FMCC Project Managers in the field to access real-time information concerning the licenses and certifications of employees to confirm they were certified and qualified for assignments. It also allowed FMCC to generate certificates it needed for project bids and safety plans and in compliance audits.

45. FMCC purchased licenses for third-party software used by it in CUTS, Fleet and Safely (the "FMCC Software"). In some instances, FMCC entered into the software licenses directly. For instance, on July 6, 2022, FMCC entered into a license agreement with Bluearrow Telematics for the use of GeoTabs in Fleet. In other instances, Shrensky, as CTO of FMCC, purchased the software for FMCC. In those situations, FMCC paid for and owned the software license procured by its employee.

46. FMCC discovered that Shrensky and JAS Investors were marketing Fleet to third-party competitors of FMCC. Additionally, Shrensky and JAS Investors were taking the position that they owned CUTS, Fleet, and Safely. As a consequence, on August 8, 2023, FMCC placed Shrensky on administrative leave pending investigation.

47. In the suspension notice attached as **Exhibit 6** , FMCC notified Shrensky that:

> I am writing to inform you that you have been suspended from Fort Myer Construction Corporation ("FMCC") pending investigation. While you are on suspension, you should not access any FMCC premises, or access any systems or

> databases or contact any FMCC employees, contractors, vendors, or customers. During this period, you will not have any authority to act on behalf of the company. Milton Hardy will be in contact with you in the next several days to schedule an interview with outside counsel.

48. Prior to suspending Shrensky, FMCC terminated his access to its communications systems and databases, including its email system and FMCC Software. However, because JAS Investors hosted FMCC Software through Azure, FMCC could not eliminate JAS's administrator credentials to FMCC Software.

49. On August 9, 2023, the day after FMCC placed Shrensky on administrative leave, FMCC sent Shrensky the letter attached as **Exhibit 7** demanding that he:

a. Take all steps necessary to establish and confirm FMCC's ownership of FMCC Software (the "FMCC Software");

b. Cease marketing and attempting to sell FMCC Software; and

c. Cease representing that JAS Investors or Shrensky owns or has an ownership interest in the FMCC Software.

50. On August 9, 2023, JAS Investors billed FMCC for hosting services for the FMCC Software through the end of August 2023. JAS Investors has not terminated the Consulting Agreement pursuant to its termination and notice provisions.

51. On August 11, 2023, Shrensky accessed without authorization the Fleet database to send the email attached as **Exhibit 8** to FMCC employees and third-parties on behalf of his father, Lewis Shrensky ("L. Shrensky"), the former Executive Vice President of FMCC. The email falsely claimed L. Shrensky was still the Executive Vice President of FMCC.

52. On October 23, 2023, counsel for FMCC sent to counsel for Defendants the litigation hold notice attached as **Exhibit 9** demanding that they preserve and not spoliate all

evidence relating to the parties' disputes concerning the ownership and use of FMCC's software and proprietary data.

53. On August 17, 2023, counsel for FMCC sent the letter attached as **Exhibit 10** to counsel for Shrensky addressing Shrensky's unauthorized access to Fleet. FMCC demanded that Shrensky cease accessing FMCC's systems, databases, and software for any purpose, cease communicating with FMCC employees, contractors and customers, and transfer administrative rights to all FMCC databases and software to FMCC.

54. That same day, in the letter attached as **Exhibit 11**, Shrensky resigned from his employment with FMCC, claiming he was "illegally placed on suspension."

**After Shrensky Resigned, He Terminated FMCC and Washington Gas' Access to CUTS**

55. On August 17, 2023, counsel for Shrensky sent the letter attached as **Exhibit 12** to FMCC's counsel claiming that Shrensky could continue to access FMCC's databases and systems because FMCC did not have the "right" to terminate him:

> As to your demands regarding Jason Shrensky, the underlying factual and legal premises are wrong: Fort Myer had no right to suspend Jason Shrensky . . . and, therefore, has no authority to demand that Jason Shrensky cease accessing Fort Myer's systems and databases and/or contacting Fort Myer's employees, contractors, vendors or customers. In any event, Jason Shrensky has resigned from Fort Myer effective today. As to any allegations concerning Jason Shrensky's access to and/or management of his own software programs, Fort Myer will receive correspondence from Jason Shrensky's intellectual property counsel in the coming days.

56. On August 18, 2023, counsel for Shrensky sent to FMCC's counsel the letter attached as **Exhibit 13**. Shrensky's counsel stated, without elaboration, that JAS Investors "owns the copyright to" CUTS. Shrensky, through counsel, demanded that FMCC purchase "a license from JAS" for the use of CUTS for an annual licensing fee of $260,000 and monthly maintenance charges at a rate of $250 per hour. Defendants do not dispute that FMCC owns Fleet and Safely.

57. That same day, in the email attached as **Exhibit 14**, counsel for FMCC asked Defendants' counsel to provide documentation supporting their position that CUTS was owned by JAS Investors. Rather than provide any agreement or other evidence concerning the ownership of CUTS, counsel merely replied with a cursory summary of the Copyright Act, stating that because "Mr. Shrensky wrote the CUTS software [he] is, therefore, the author and owner of the copyright in CUTS." *Id.*

58. On August 24, 2023, FMCC's counsel sent to counsel for Shrensky the email attached as **Exhibit 15** in an attempt to amicably resolve the ownership dispute, explaining FMCC's position that it owned or, at a minimum, had a joint ownership interest in CUTS, and proposing that the parties reach a mutually agreeable resolution for the use and licensing of CUTS.

59. Counsel for Defendants rejected FMCC's proposal in the letter attached as **Exhibit 16**, stating "[w]e are not interested in negotiating a 'mutually-agreeable resolution' for the licensing of CUTS . . . FMCC has no rights in CUTS software developed solely by Jason Shrensky."

60. On August 25, 2023, in violation of the Consulting Agreement between FMCC and JAS Investors, Shrensky used his administrator access to terminate FMCC's access to CUTS. As a consequence, employees at FMCC and Washington Gas no longer had access to CUTS to coordinate and implement Washington Gas Cuts.

61. Shrensky knew that, by unilaterally depriving FMCC and Washington Gas of their access to CUTS, FMCC's ability to provide critical repairs and to comply with its obligations under the Washington Gas Agreement would be impaired.

62. Shrensky's actions in eliminating access to CUTS had devastating immediate consequences for FMCC and Washington Gas. For the over 800 pending Cuts work requests from Washington Gas, FMCC was required manually to locate and input Cuts information into Excel

spreadsheets to attempt to "recreate" the information that had been readily accessible to it through CUTS. As a result, FMCC's ability to perform its obligations under the Washington Gas Agreement was substantially impaired. As explained in Paragraph 66 below, Shrensky's willful termination of access and refusal to transfer or return CUTs to FMCC has caused substantial, ongoing damage to FMCC and its relationship with Washington Gas.

**When FMCC Filed A Motion for Injunctive Relief Seeking Access to the FMCC Software, Defendants Spoliated FMCC's Software and Data and Terminated its Access to Fleet and Safely**

63. On August 31, 2023, FMCC filed an emergency motion for a temporary restraining order seeking, among other things, an order prohibiting Defendants from accessing, using or disclosing the FMCC Software and compelling them to return the FMCC Software to FMCC.

64. The next day, FMCC and Defendants attended a hearing on FMCC's motion. At the hearing, Judge Chutkan determined that, because FMCC had filed an earlier case in this Court against L. Shrensky, Shrensky's father, FMCC's case against Shrensky and JAS Investors should be assigned to Judge Nichols. The Court did not address the merits of FMCC's Motion.

65. Immediately after the hearing, counsel for Defendants, Abigail Johansen and Terence Ross, informed FMCC that Defendants were returning to FMCC (1) the raw data in CUTS and (2) the software and raw data for Fleet and Safely.

66. At 8:43 a.m. on September 5, 2023, Ms. Johansen sent the email attached as **Exhibit 17** to Ms. Bertram purporting to terminate the hosting services provided by JAS Investors.

> As you know JAS Investors Maryland, LLC ("JAS") provided hosting services and ancillary software services to Fort Myer Construction Corporation ("FMCC") for the software programs known at FMCC as "FLEET" and "SAFELY." FMCC paid JAS for the cost associated with these services. However, in light of the accusations you made against Mr. Shrensky in court on Friday regarding FLEETS, JAS does not feel it can continue to offer these services to FMCC. . . .. Accordingly, effective immediately, JAS will cease hosting FLEET and SAFELY and will no longer provide any service relating thereto. to FMCC, which FMCC had paid through October 31, 2023

Ms. Johansen also stated in the letter that: "JAS is currently preparing a copy of the FLEET and SAFELY databases, blob data, and the source code for the two software programs in order to return them to FMCC. We hope to be able to have these ready to return to you by the end of the day today."

67. The drives were delivered to Ms. Bertram's office at approximately 9:14 a.m. on September 5, 2023. At 9:15 a.m., Defendants terminated FMCC's access to Fleet and Safely while FMCC was processing payroll for employees through Fleet.

68. At 2:00 p.m. on September 5, 2023, Ms. Bertram spoke with Mr. Ross and Ms. Johansen regarding CUTS, Safely, and Fleet. During this conversation, Ms. Bertram informed Mr. Ross that FMCC was unable to process payroll for its employees due to Shrensky's termination of FMCC's access to Fleet. Ms. Bertram requested clarity on why the data was being sent to her office piecemeal, explaining that Shrensky only needed to continue to host the software until FMCC identified a new provider to host it. In response, Mr. Ross stated that there was "nothing to host" ***because Shrensky had already deleted all of the software and the data for Fleet***. *See* **Ex. 20.**

69. When a FMCC representative opened the package that Defendants had sent to Ms. Bertram's office, it included a handwritten note stating: "[u]pon confirmation from you of receipt of the foregoing, Mr. Shrensky will permanently delete that data from the servers."

70. Ms. Bertram sent Ms. Johansen and Mr. Ross the email attached as **Exhibit 18** on September 6, 2023, stating that "the data in the possession, custody and control of Mr. Jason Shrensky and JAS Investors ***should not be deleted because it is relevant to and should be retained for pending litigation between the parties."***

71. That same day, FMCC determined that the Fleet and Safely software and data Defendants had sent Ms. Bertram had been disassembled and was in an unusable form. Milestone,

a consultant retained by FMCC, informed FMCC that it would take several days for Milestone to create a program to even read the data on the drives.

72. On September 7, 2023, Ms. Bertram sent Ms. Johansen and Mr. Ross the email attached as **Exhibit 19** following up on her communication the day before. Ms. Bertram wrote "I have not received a response to my email yesterday concerning the deletion of the Fleet, Safely, and Cuts data. Please let me know whether Mr. Shrensky deleted the data." Ms. Bertram also informed counsel that FMCC employees had identified a testing or staging site for Fleet with the data intact through 9:15 a.m. on September 5, 2023. Ms. Bertram demanded that Defendants "allow Fleet users to access the database and transfer Azure hosting for the site to FMCC's consultant." Azure is the Microsoft software used by FMCC to develop the Fleet software and host Fleet data.

73. Despite FMCC's repeated demands, Defendants have refused to return or transfer to FMCC a complete and functioning version of CUTS, Fleet or Safely.

**FMCC Has Suffered Substantial Damages Because of Defendants' Actions In Refusing to Return Is Software and Proprietary Data**

74. For Fleet, because the software had been adulterated and was not functional, Milestone, the consultant retained by FMCC, had to undertake a workflow analysis to determine the use and functionality of the software. Then, Milestone had to reprogram and restore links and source code Defendants had deleted from the software, reinstall the links and source code, and undertake a series of beta tests to identify and address remaining problems caused by the deletion. This process, which would have been seamless if Defendants had transferred it properly, took over six months. FMCC is still working with Milestone to address lingering functionality problems caused by Defendants' adulteration of Fleet.

75. FMCC has not been able to restore Safely or the data on it. FMCC has been forced to use a patchwork of other software and systems to manage certification and training data for FMCC employees on a going-forward basis. However, it has not been able to identify a system that performs several of the key functions of Safely, including maintaining a historical set of licenses and certifications, confirming certifications in real-time for job assignments, generating certification forms, and managing the recertification processes. Many of these functions now have to be performed by hand by FMCC employees or through less effective systems, resulting in the loss of man-hours and exposing FMCC to safety and compliance risks. FMCC is in the process of sourcing a Licensing Management System to replace Safety and, after it is acquired, employees will be required again to expend hundreds of hours re-entering the historical data in that was in Safely.

76. Defendants have refused and continue to refuse to return a complete and functioning version of CUTS to FMCC. When FMCC and its consultant reviewed the data on the drive delivered to Ms. Bertram's office, they determined that it only included 15,000 .pdfs of data. Since the receipt of the drive, FMCC has undertaken the laborious process of opening each .pdf, manually entering the data on it into a database, and then comparing it to the Washington Gas ARMS database to determine the status of the work and whether FMCC has billed Washington Gas for it. In some instances, FMCC had to conduct site visits to determine the status of the work. For certain periods, FMCC's billings to Washington Gas have been delayed for over a year, depriving FMCC of substantial income.

77. The delays caused by the deletion of CUTS and its database have caused FMCC to receive reduced performance metrics ratings from Washington Gas. The resulting percentage reduction will reduce the compensation received by FMCC for the life of its contract with Washington Gas.

**FIRST CAUSE OF ACTION**
**(Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 – Defendants Shrensky and JAS Investors)**

78. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

79. FMCC owns and possesses certain Confidential Information that it has compiled after many years of substantial effort and significant financial investment. FMCC's Confidential Information includes the FMCC Software and the data in it.

80. The Confidential Information, including the FMCC Software and the data in it, was at all times prior to Defendants' misappropriation kept secret from the public.

81. FMCC's Confidential Information derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. The FMCC Software allowed FMCC efficiently to manage its operations, equipment and personnel, allowing the Company to charge more competitive rates for its construction projects. Furthermore, as Shrensky recognized, CUTS and its compatibility with ARMS ensured that no competitor could manage Washington Gas Cuts more effectively and efficiently than FMCC. These competitive advantages would be lost if FMCC's Confidential Information became generally known.

82. FMCC has made reasonable efforts under the circumstances to preserve the confidentiality of its Confidential Information. These efforts include requiring employees to sign confidentiality and other employment agreements, using passwords to protect access to Confidential Information on company computers, and limiting access to FMCC's Confidential Information on a need-to-know basis.

83. This Confidential Information constitutes FMCC's trade secrets.

84. FMCC's trade secrets were used in interstate commerce and were related to services in interstate commerce, namely, working and interfacing with Washington Gas employees and systems employed and housed in Virginia. This work was performed under a contract between FMCC, a corporation incorporated in Virginia and located in the District of Columbia, and Washington Gas, a corporation located in Virginia. Fleet and Safely were both used to manage work, employees and equipment throughout the District of Columbia, Maryland, and Virginia. Shrensky performed work on FMCC's trade secrets from his office in Maryland and FMCC's offices in the District of Columbia and he attended meetings with Washington Gas in Virginia.

85. Shrensky and JAS Investors acquired FMCC's trade secrets under circumstances giving rise to a duty to maintain the secrecy of FMCC's trade secrets by entering into the Consulting Agreement and Confidentiality Agreement and working on software programs based on FMCC's Confidential Information that is the exclusive property of FMCC.

86. Shrensky knowingly and improperly used and disclosed FMCC's trade secrets by depriving FMCC of access to them, using them for the benefit of Shrensky and his company, JAS Investors, and purportedly deleting confidential data contained in them. These actions breached Defendants' duty to maintain the secrecy of FMCC's trade secrets.

87. Despite FMCC's requests, Shrensky has refused to return and to discontinue his misuse of FMCC's trade secrets.

88. If Shrensky is not enjoined, he will continue to use, disclose, or otherwise misappropriate FMCC's trade secrets for his benefit and to FMCC's detriment.

89. Shrensky's misappropriation of FMCC's trade secrets has caused and continues to cause substantial injury to FMCC's business interests and reputation, including, but not limited to, actual damages, lost profits, harm to its reputation, and the diminution of the value of FMCC's trade secrets. Shrensky has further been unjustly enriched by his misappropriation of FMCC's

trade secrets, for example by enhancing Shrensky's ability to compete and allow others to compete in FMCC's industry.

90. FMCC therefore seeks injunctive relief under 18 U.S.C. § 1836(b)(3)(A) to protect the secrecy of FMCC's trade secrets and to remedy injury to FMCC's business interests and reputation. FMCC will continue to suffer irreparable harm absent the requested injunctive relief.

91. FMCC also seeks an award of actual damages and damages for unjust enrichment in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

92. Shrensky misappropriated FMCC's trade secrets for an improper purpose and in a willful and malicious manner. FMCC therefore seeks exemplary damages up to two times the award of actual damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D), together with pre- and post-judgment interest.

## SECOND CAUSE OF ACTION

**(Trade Secret Misappropriation Under the District of Columbia Uniform Trade Secrets Act, D.C. Code § 36-401 – Defendants Shrensky and JAS Investors)**

93. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

94. For the same reasons set forth above in relation to the First Cause of Action, Shrensky and JAS Investors have misappropriated FMCC's trade secrets under District of Columbia law.

95. Defendants' misappropriation of FMCC's trade secrets has directly and proximately caused damage to FMCC and its business. FMCC is therefore entitled to an award of actual damages in an amount to be proven at trial.

96. At all times, the above-described actions have caused and are continuing to cause irreparable injury to FMCC, for which FMCC has no adequate remedy at law, and will continue

to cause irreparable injury unless enjoined. FMCC therefore seeks injunctive relief against Shrensky and JAS Investors to prevent further damage and harm to FMCC under D.C. Code § 36-402.

97. FMCC also seeks an award of actual damages and damages for unjust enrichment in an amount to be proven at trial under D.C. Code § 36-403(a), together with pre- and post-judgment interest.

98. Defendants' misappropriation of FMCC's trade secrets has been conducted in a willful and malicious manner. FMCC therefore seeks exemplary damages in an amount not exceeding twice the award of damages under D.C. Code § 36-403(b) as well as its attorney's fees under D.C. Code § 36-404.

**THIRD CAUSE OF ACTION**
**(Breach of Contract – Defendant JAS Investors)**

99. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

100. FMCC, through its affiliate First Veitch Street Corporation ("FVSC"), entered into an express, written agreement with Shrensky and JAS Investors (the "Consulting Agreement") (attached as **Exhibit 21**). The Consulting Agreement is signed by Shrensky on behalf of JAS and his father, L. Shrensky, on behalf of FVSC. Although the Consulting Agreement has an Effective Date of April 1, 2014, it was not signed by the parties until August 30, 2014.

101. FVSC, an entity owned by the same owners as FMCC and managed at the time by the same officers as FMCC, entered into the Consulting Agreement for the direct benefit and performance of work for FMCC. JAS and Shrensky intended to tender performance under the contract directly to FMCC. As an intended beneficiary of and successor to FVSC under the

Consulting Agreement, FMCC is entitled to performance under and remedies for breach by JAS Investors of the Consulting Agreement.

102. FMCC fully performed its obligations under the Consulting Agreement.

103. Pursuant to Section Five of the Consulting Agreement, JAS Investors agreed not to use or disclose FMCC's Confidential Information.

104. Pursuant to Section Five of the Consulting Agreement, JAS Investors also agreed to treat all work product created by JAS Investors as the "sole and exclusive property" of FMCC and to assign to FMCC all "right, title, and interest in any ideas, concepts, information, materials, improvements, designs, or any other work product created, conceived, or developed by" JAS Investors for FMCC.

105. Pursuant to Section Six of the Consulting Agreement, JAS Investors could only terminate (1) "upon thirty (30) days prior written notice to Client" when no Project Assignment was in effect; or (2) if FMCC "materially breached the Agreement and failed to cure such breach within ten (10) days of receipt of notice by the non-breaching party."

106. Pursuant to Section Six of the Consulting Agreement, JAS Investors agreed to "reasonably cooperate in transitioning the Consultant's work, information, programs and other proprietary materials or information to Client or to such persons as the Client directs" at the time of termination.

107. In Section Eight of the Consulting Agreement, JAS Investors represented and warranted that "Consultant has the right and unrestricted ability to assign ownership of any work product produced in furtherance of the Project Assignment to Client a[s] set forth in Section 5." JAS Investors further agreed in Section Eight to "***indemnify and hold Client harmless*** from any and all damages, costs, claims, expenses, or other liability (including reasonable attorneys' fees)

arising from or relating to the breach or alleged breach by Consultant of the representations and warranties set forth in this Section 8."

108. JAS Investors agreed in Section Seven of the Consulting Agreement that the "substantially prevailing party shall be entitled to reasonable attorney's fees and costs" in any litigation between JAS Investors and FMCC.

109. Pursuant to Section Eleven of the Consulting Agreement, JAS Investors agreed that "[d]uring the term of this Agreement, Consultant will not accept work, enter into contract, or accept an obligation from any third-party, inconsistent or incompatible with Consultant's obligations or the scope of services rendered for Client under this Agreement."

110. Section Twelve of the Consulting Agreement provided that "this Agreement will be for the benefit of Client's successors and assigns."

111. Section Thirteen specified the form, delivery and recipients of notice required by the Consulting Agreement.

112. JAS Investors breached these terms of the Consulting Agreement by:

a. Failing to assign any of the rights Shrensky or it claims in CUTS to FMCC;

b. Asserting ownership in CUTS by JAS Investors or Shrensky;

c. Representing to third-parties that JAS Investors or Shrensky owns CUTS;

d. Retaining CUTS and/or related documentation and data after the Consulting Agreement was terminated;

e. Soliciting additional compensation from FMCC with respect to CUTS after the Consulting Agreement was terminated;

f. Marketing CUTS, Fleet and Safely to third-parties;

g. Disclosing Confidential Information of FMCC to third-parties;

h. Purporting to terminate the Consulting Agreement in violation of the termination and notice provisions of the Consulting Agreement;

i. Terminating hosting of CUTS, Fleet and Safely;

j. Deleting and adulterating CUTS, Fleet and Safely;

k. Failing and refusing to return to FMCC the Fleet and Safely software and databases hosted by JAS Investors; and

l. Failing and refusing to transfer to FMCC third-party software licenses purchased on behalf of and paid for by FMCC.

113. As a direct and proximate result of these breaches, FMCC has been and will continue to be harmed. FMCC has lost the benefit of ownership of CUTS, Fleet and Safely, has been forced to file this lawsuit for JAS Investors' breaches of the Consulting Agreement, has been deprived of revenue under the Washington Gas Agreement, has suffered reputational and business injury to its relationship with Washington Gas, and has incurred and will continue to incur substantial costs in recreating and repairing CUTS, Fleet and Safely.

114. Also, under Section Eight of the Consulting Agreement, FMCC is entitled to recover its reasonable attorneys' fees and costs it has incurred in bringing this lawsuit against JAS Investors to enforce its rights under the Agreement.

115. Because Defendants breached the representations and warranties set forth in Section Eight of the Consulting Agreement, Plaintiff also seeks indemnity pursuant to Section Eight for all damages, costs, claims expenses and other liability, including attorneys' fees, arising from and relating to such breach.

116. Plaintiff seeks an award of compensatory damages in an amount to be proven at trial, together with attorneys' fees and pre- and post-judgment interest.

**FOURTH CAUSE OF ACTION**
**(Breach of Confidentiality Agreement – Defendant Shrensky)**

117. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

118. The Confidentiality Agreements attached as **Exhibit 4** is an express, written agreement between FMCC and Shrensky.

119. FMCC fully performed its obligations under the Confidentiality Agreement.

120. Shrensky breached the terms of the Confidentiality Agreement by misappropriating confidential and proprietary information and property from FMCC, actively using FMCC's confidential and proprietary information and property for the benefit of Shrensky and JAS Investors, and purportedly deleting and altering FMCC's confidential and proprietary information and property.

121. Shrensky's breach of the Confidentiality Agreement has actually and proximately caused FMCC to suffer damages.

122. Plaintiff seeks an award of compensatory damages in an amount to be proven at trial, together with contractual attorneys' fees and costs and pre- and post-judgment interest.

**FIFTH CAUSE OF ACTION**
**(Conversion – Defendants – Confidential Information)**

123. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

124. Defendants exercised ownership, dominion and control over Confidential Information that otherwise lawfully belonged to FMCC.

125. Defendants obtained such ownership, dominion and control over FMCC's Confidential through improper means, including violations and breaches of Defendants' Confidentiality Agreement and Consulting Agreement.

126. Through Shrensky's removal and refusal to return FMCC's Confidential Information, FMCC has been deprived of its possessory rights in its property.

127. FMCC has been directly and proximately injured by Defendants' unlawful conversion of its property.

128. FMCC seeks an award of monetary damages in an amount to be proven at trial, punitive damages, costs and attorneys fees' and costs, together with pre- and post-judgment interest.

**SIXTH CAUSE OF ACTION**
**(Tortious Interference with Business Relations – Defendant Shrensky)**

129. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

130. FMCC is party to a business relationship with Washington Gas.

131. Shrensky was aware of FMCC's business relationship with Washington Gas.

132. Shrensky deliberately and without privilege, justification, or authorization interfered with FMCC and Washington Gas' agreed-upon contractual and business relationship, for the wrongful purpose of depriving FMCC of the full benefit of that relationship.

133. Given Shrensky's central role in facilitating FMCC's business relationship with Washington Gas and his intimate familiarity with CUTS, he knew that terminating FMCC and Washington Gas' access to CUTS was substantially certain to impair FMCC's ability to complete the Cuts assigned to it by Washington Gas and otherwise comply with the Washington Gas Agreement.

134. Shrensky's actions knowingly and willfully interfered with FMCC and Washington Gas' business relationship by delaying the completion of assigned Cuts, impairing FMCC's ability to comply with its contractual obligations under the Washington Gas Agreement, reducing for the

life of the Washington Gas Agreement the rate at which FMCC will be compensated, and damaging FMCC's goodwill and reputation and the parties' working relationship.

135. Shrensky's wrongful and intentional activities constitute tortious interference with FMCC's business relations.

136. As a direct, foreseeable, and proximate result of Shrensky's knowing and intentional tortious interference, FMCC suffered damages. FMCC incurred substantial expense rebuilding the CUTS database and implementing alternative means to comply with its contractual obligations to Washington Gas. In addition, FMCC's performance metrics declined, causing its compensation under the Washington Gas Agreement to be reduced for the term of the contract and all future contracts with Washington Gas.

137. FMCC is entitled to punitive damages resulting from Shrensky's wanton, willful, and malicious conduct, all of which was undertaken by Shrensky with a reckless disregard for FMCC's rights.

138. FMCC seeks an award of monetary damages in an amount to be proven at trial, punitive damages, costs and attorney's fees, together with pre- and post-judgment interest.

**SEVENTH CAUSE OF ACTION**
**(Declaratory Judgment, Copyright – Defendants Shrensky and JAS Investors)**

139. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

140. There currently exists between FMCC, Shrensky and JAS Investors a dispute regarding the ownership of CUTS and intellectual property rights, including copyrights, in CUTS. Shrensky and JAS Investors have asserted, both in correspondence from counsel and in this litigation, that JAS Investors is the owner of CUTS and has rights in CUTS.

141. FMCC is the sole copyright owner of CUTS. It created the original version of CUTS in-house. Then, FMCC hired Shrensky and JAS Investors under the Work for Hire provisions of the Copyright Act, 17 U.S.C. § 101 as employees of FMCC to make enhancements and modifications to CUTS. To the extent that Shrensky or JAS Investors had any rights to or in CUTS, they assigned those rights to FMCC through the Consulting Agreement and Confidentiality Agreement.

142. In connection with their work for FMCC under the Consulting Agreement, Shrensky and JAS Investors were employees for copyright purposes as specified in 17 U.S.C. § 101 because:

a. FMCC provided them with extensive resources and information, including personnel, equipment, Confidential Information of FMCC, confidential internal customer data of Washington Gas, technical data, and other corporate resources.

b. FMCC provided substantial background information and guidance to them regarding the CUTS systems and their expectations with respect to the enhancements to CUTS.

c. FMCC had the right to and did assign additional projects to Shrensky and JAS Investors. While working as a putative "consultant," they performed the role of a project manager for the Washington Gas Agreement, the role he continued in December 2021 as CTO.

d. In their interactions with Washington Gas and others, Shrensky held himself out as authorized representatives of FMCC that was authorized to speak on behalf of the Company concerning its line business activities.

e. Neither JAS Investors nor Shrensky hired any assistants or staff to assist them in performing work for FMCC.

f. The salary FMCC paid Shrensky after FMCC hired him as CTO was comparable to the fees he was paid as a putative consultant for FMCC.

g. The work performed by them was part of the regular business of FMCC performing construction work for clients in the DMV, including Washington Gas.

h. They routinely worked from FMCC facilities and offices while implementing changes to CUTS.

143. FMCC is entitled to a declaration pursuant to 28 U.S.C. § 2201 that Shrensky and JAS Consulting are not owners of CUTS and have assigned to FMCC the CUTS software and all intellectual property rights to the CUTS software, including any copyrights in the software.

**EIGHTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty – Defendant Shrensky)**

144. FMCC realleges and incorporates herein by reference each and every allegation above and below as though set forth in full herein.

145. Shrensky owed to FMCC the fiduciary duties of care and loyalty in his capacity as Chief Technology Officer.

146. Shrensky's fiduciary duties of care and loyalty required him to act solely in the interest of FMCC, act in accordance with his Confidentiality Agreement, act within the limits of his authority as an Officer of FMCC, and to disclose and offer to FMCC corporate opportunities of which he became aware

147. Shrensky breached his fiduciary duties to FMCC by:

a. Misappropriating the FMCC Software to which he had access as CTO and using it for his own benefit and for the benefit of his own company, JAS Investors;

b. Making false representations to third-parties that he and his company owned the FMCC Software and attempting to sell the software to third-parties;

c. Not disclosing to FMCC and making it aware of opportunities available to it concerning the development and marketing of FMCC Software; and

d. Disclosing confidential information related to the FMCC Software, in violation of his Confidentiality Agreement.

**NINTH CAUSE OF ACTION**
**(Unjust Enrichment – Defendants Shrensky and JAS Investors)**

148. FMCC realleges and incorporates herein by reference each and every allegation below and above as though set forth in full herein.

149. FMCC conferred financial benefits on Defendants, including over $400,000 in compensation and software licensing and hosting costs under the Consulting Agreement, in expectation of and reliance on Defendants maintaining FMCC's ownership in and access to CUTS, Fleet and Safely and the data and software in it.

150. Despite Defendants' knowledge that such benefits were conferred in exchange for continued ownership of and access to CUTS, Fleet and Safely, Defendants unilaterally terminated FMCC's access to such software, adulterated such software, and purported to delete CUTS, Fleet and Safely and the data and software in it. Defendants wrongfully continue to withhold access to such software and data despite receiving the benefits conferred by FMCC.

151. Defendants would be unjustly enriched by FMCC's payments to them if they were entitled to retain them.

152. It would be unjust and inequitable for Defendants to retain the financial benefits conferred by FMCC in exchange for its access to and ownership of CUTS, Fleet and Safely.

153. Wherefore, FMCC requests this honorable Court to use its equitable powers to order restitution to FMCC of an amount to be determined at trial, an award of its attorney's fees and costs, and for all other relief as justice so requires.

**PRAYER FOR RELIEF**

WHEREFORE, FMCC respectfully requests that the Court:

a. Enter judgment against Defendants and in favor of Plaintiff FMCC in an amount to be proven at trial, plus pre-judgment and post-judgment interest, plus the attorneys' fees and costs incurred this action, plus punitive and exemplary damages;

b. Enter injunctive relief enjoining Defendants from accessing, using, deleting, selling, or attempting to sell Plaintiff FMCC's FMCC Software;

c. Enter injunctive relief compelling Defendants to reinstate Plaintiff FMCC's access to the FMCC Software;

d. Pursuant to 28 U.S.C. § 2201, issue a declaration that Shrensky and JAS Investors do not have any copyright in CUTS and FMCC owns all copyright in CUTS; and

e. Grant such further relief as the Court may deem appropriate

Jury Trial Requested.

Dated: September 11, 2024

Respectfully submitted,

BERTRAM LLP

By: ______________________
Connie N. Bertram

BERTRAM LLP
1717 K Street, NW, Suite 900
Washington, DC 20006

Telephone: (866) 456-1159
Email: cbertram@bertramllp.com
D.C. Bar No. 435840

*Counsel for Plaintiff*
FORT MYER CONSTRUCTION
CORPORATION